**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Robert SILVER, Defendant–Appellant.**

No. 00–50071.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 17, 2000

Filed April 6, 2001

Jerry L. Newton, Newton & Newton, Hermosa Beach, California, for the defendant-appellant.

Edward B. Moreton, Jr., Assistant United States Attorney, Criminal Division, Los Angeles, California, for the plaintiff-appellee.

Before: T.G. NELSON and WILLIAM A. FLETCHER, Circuit Judges, and REED,* District Judge.

REED, District Judge:

Appellant Robert Silver ("Silver") was convicted of one count of making false statements to the United States Department of Defense ("DOD") in violation of 18 U.S.C. § 287.[1]

Silver challenges Judge Keller's failure to recuse himself from the case, the district court's determination of the "actual loss," and the district court's determination of his criminal history category. We affirm in part and reverse in part.

## I

## FACTS AND PROCEEDINGS BELOW

The Department of Defense ("DOD") awards contracts and purchase orders for general supplies to companies and individuals. In March 1991, appellant and his wife, Judith Silver, founded Silver Sales, Inc. ("SSI"), which purchased supplies from various sources and resold them to the DOD and others. Silver was president of SSI from approximately April 1991, until February 1993.

On December 10, 1991, the DOD suspended Silver from doing business with the United States government for three years. On February 1, 1993, SSI submitted corporate minutes to the Small Business Administration ("SBA") indicating that Frank Garrett, an African–American, had acquired 51 percent ownership of SSI, with appellant's wife retaining 49 percent ownership. On July 2, 1993, the DOD notified Silver that he, as an individual, was being considered for debarment.[2] Silver was subsequently debarred until December 9, 1994. On February 28, 1995, the DOD extended Silver's debarment until December 7, 1997.

From November 18, 1993 to August 30, 1994, SSI entered into contracts with the DOD. Although the invoices submitted to the DOD stated that SSI had provided the DOD with the products specified in the contracts, SSI had used generic products instead.

On November 16, 1994, the DOD warned SSI that the company was being considered for debarment. On March 1, 1995, the DOD debarred SSI until November 15, 1997.

On March 26, 1999, Silver was charged with violating 18 U.S.C. § 287 in connection with his product substitution scheme. On April 26, 1999, a hearing was held in the case and defense counsel advised the court that he would be bringing a recusal motion, but that the defendant did not object to entering his guilty plea before Judge Keller. On May 3, 1999, the defendant filed his recusal motion, which the district court denied on May 11, 1999.

---

* The Honorable Edward C. Reed, Jr., Senior United States District Judge for the District of Nevada, sitting by designation.

1. Title 18 U.S.C. § 287 states as follows:
   Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title.

2. Through an action known as debarment the DOD excludes persons and companies from entering into contracts with the United States based on evidence of certain illegal and improper conduct. A person or company may be suspended before being formally proposed for debarment. The law provides that companies or persons who are debarred, proposed for debarment, or suspended may not receive United States government contracts and that government agencies may not solicit offers from, or award contracts to, such persons and companies.

On May 17, 1999, Silver pled guilty to one count of violating 18 U.S.C. § 287. The district court found that the offense charged, making a false statement in violation of 18 U.S.C. § 287, commenced February 1, 1993, when SSI filed corporate minutes stating Frank Garrett owned 51% of Silver Sales. Silver had a prior felony conviction dated February 7, 1983. The district court added two points to Silver's criminal history pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 4A1.2(e)(2), moving Silver from a criminal history category III to category IV. The district court held that the sale of generic goods by Silver to the DOD resulted in an "actual loss" of $148,088.93, which gave Silver an offense level of 14.

On February 1, 2000, the district court sentenced defendant to 33 months imprisonment, three years supervised release, and a $50 special assessment. In addition, the district court ordered defendant to pay restitution to the United States in the amount of $148,088.93.

Silver challenges Judge Keller's failure to recuse himself from the case. Silver also challenges the district court's determination of "actual loss" and the determination of his criminal history category.

## II

## STANDARD OF REVIEW

■ The district court's factual findings are reviewed for clear error. *United States v. Lopez–Sandoval*, 146 F.3d 712, 714 (9th Cir.1998). A district court's decision whether to grant a motion for recusal is reviewed for an abuse of discretion. *See United States v. Hernandez*, 109 F.3d 1450, 1453 (9th Cir.1997). The district court's interpretation and application of the Sentencing Guidelines are reviewed de novo. *United States v. Castillo*, 181 F.3d 1129, 1134–35 (9th Cir.1999).

## III

## ANALYSIS

A. *Recusal Statute*

■ Title 28, United States Code, Section 455, states in relevant part:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

.  .  .  .  .

(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding, or expressed an opinion concerning the merits of the particular case in controversy [.]

28 U.S.C. § 455 (1993). Silver argues that Judge Keller should have recused himself from the case under § 455 because he served as United States Attorney for the Central District of California during two of the years in which Silver was investigated for mail fraud in 1982 and therefore, Judge Keller's impartiality might reasonably be questioned.

Judge Keller served as United States Attorney from 1972 to July of 1977. In 1982, an indictment was filed charging Silver with fifteen counts of mail fraud. The indictment brought against Silver alleged that his criminal activities of mail fraud began in November of 1975 and continued until August of 1980. Silver argues that because part of the criminal investigation for mail fraud occurred while Judge Keller was United States Attorney, the appearance of bias or prejudice is of paramount concern and the sentencing by Judge Keller for Silver's current offense gives the impression that it is "pay back time." Sil-

ver relies on *United States v. Arnpriester*, 37 F.3d 466 (9th Cir.1994), to support his argument that Judge Keller should not have presided over a case that began when he was United States Attorney.

In *Arnpriester*, we held that "a United States District Judge cannot adjudicate a case that he or she as United States Attorney began." *Id.* at 467. Arnpriester was convicted of several crimes and appealed his conviction; this court affirmed all but one conviction.

While his appeal was pending, Arnpriester moved for a new trial on the grounds that the trial judge should have recused himself. The trial judge referred Arnpriester's recusal motion to Judge Stephen McNamee, who had been appointed United States District Judge for the District of Arizona three months prior to Arnpriester's indictment. Judge McNamee had been the United States Attorney during the investigation that ultimately led to the indictment against Arnpriester. Judge McNamee denied Arnpriester's motion and Arnpriester appealed.

We held that Judge McNamee should have recused himself from making a decision on Arnpriester's motion. The statutory duty of each United States Attorney includes responsibility for prosecution and investigation, and the attorney responsible for the "precedent investigation of a person suspected of violation of the laws of the United States would reasonably be believed not to be impartial when that person was subsequently indicted, tried, or convicted." *Id.* at 467.

The government argues that recusal was not required in this case because there is no reasonable basis for questioning Judge Keller's impartiality.[3] Judge Keller

ceased being United States Attorney in 1977, a few years before Silver was indicted. There is no factual connection or relationship between the current case and the 1982 mail fraud case; the crimes involved are different as are the facts surrounding the cases. *See e.g., United States v. Outler*, 659 F.2d 1306, 1312–13 (5th Cir.1981)(stating that recusal is necessary under § 455(b)(3) "when the two proceedings have a common, single transaction or event at issue"). The government notes that Judge Keller was not aware of the defendant or the case during the time he was United States Attorney.

■ Silver urges this court to read *Arnpriester* to require a judge to recuse himself whenever he has served as United States Attorney in any other matter relating to the defendant presently before the judge. We decline to adopt such a broad interpretation of our holding in *Arnpriester*, which was decided on a narrow set of facts that are distinguishable from the present case.

Arnpriester was before Judge McNamee on the same crimes for which Judge McNamee's office had investigated him. Other circuits have interpreted 28 U.S.C. § 455 to require disqualification of a judge "only when the case before him is the same as or is related to the case which was within his jurisdiction as prosecuting attorney." *Jenkins v. Bordenkircher*, 611 F.2d 162, 165 (6th Cir.1979); *see also Outler*, 659 F.2d at 1312–13 (stating that recusal is only necessary if the "two proceedings have a common, single transaction or event at issue").

In the present case, the crimes for which Silver was indicted are different from the

---

**3.** The motion was denied on May 11, 1999. The order stated that Judge Keller was not aware of the defendant or the case during the time he served as United States Attorney and that he neither participated as counsel in the earlier proceedings nor expressed an opinion regarding the merits of the case. It also stated that it is not clear that an investigation was underway while Judge Keller was United States Attorney.

mail fraud indictment in 1982. *See Gravenmier v. United States,* 469 F.2d 66 (9th Cir.1972) (holding that a judge, who as United States Attorney was of counsel when a defendant was tried and convicted of one charge, is not disqualified from presiding at the prosecution of the same defendant for an unrelated offense). Silver's 1982 conviction was used only, for purposes of sentencing, to enhance the instant offense of making a false statement in violation of 18 U.S.C. § 287. Judge Keller did not participate in the conviction of Silver for mail fraud. Judge Keller was not asked to make any determinations or to render an opinion on the mail fraud conviction. Judge Keller simply determined if the conviction for mail fraud in 1982 was within ten years of the commencement of the instant offense.

Furthermore, Arnpriester's indictment took place three months after Judge McNamee was appointed to the bench. By contrast, there was more than a ten year lapse between Silver's 1975 mail fraud investigation and his current indictment. Judge Keller served as United States Attorney until July of 1977 and the investigation against Silver began in November of 1975 and lasted until August of 1980. There is only a two year overlap between Judge Keller's service as United States Attorney and the five year investigation carried out against Silver. That Judge Keller was United States Attorney during the initial phase of Silver's investigation does not lead a reasonable person to question Judge Keller's impartiality.

For the reasons discussed above, it was not necessary for Judge Keller to recuse himself.

## B. *Actual Loss*

█ The issue of whether the district court should have considered the market value of the disposed products when calculating the loss caused by Silver involves an interpretation of the sentencing guidelines. Therefore, the district court's conclusion is reviewed de novo. *See United States v. Castillo,* 181 F.3d 1129, 1134–35 (9th Cir. 1999).

Silver argues that, because the DOD used most of the products without complaint or incident, the products disposed of had a market value, *i.e.* a resale value. At oral argument Silver argued that Application Note 8(c) to U.S.S.G. § 2F1.1, which addresses consequential damages in product substitution cases, can be read in conjunction with Application Note 8(a). Therefore, Silver contends that the market value of the goods disposed of should have been deducted from the disposal costs in the district court's loss calculation.

The government argues that Application Note 8(c) to U.S.S.G. § 2F1.1 contradicts Silver's argument. The government contends that Application Note 8(c) makes clear that loss in a product substitution case such as this one includes the amount the government spent to dispose of the substituted products, and the amount spent to obtain replacement products. The parties stipulated that the government spent $78,055.82 to dispose of the products provided by Silver and $70,033.11 to obtain replacement products. Therefore, the government argues that the district court correctly found that the DOD's loss was $148,088.93, the total of the two aforementioned amounts.

We agree with Appellant's argument and hold that the district court should have considered the market value of the disposed products when calculating the actual loss. Application Note 8 to U.S.S.G. § 2F1.1 addresses the valuation of loss applicable in offenses involving fraud or deceit. There are two damage calculations at issue in this case: expectation damages and consequential damages. Expectation damages and how they are calculated are

discussed in Application Note 8(a) which states:

*Fraud Involving Misrepresentation of the Value of an Item or Product Substitution*

A fraud may involve the misrepresentation of the value of an item that does have some value (in contrast to an item that is worthless). Where, for example, a defendant fraudulently represents that stock is worth $40,000 and the stock is worth only $10,000, the loss is the amount by which the stock was overvalued (i.e., $30,000). In a case involving a misrepresentation concerning the quality of a consumer product, the loss is the difference between the amount paid by the victim for the product and the amount for which the victim could resell the product received.

USSG § 2F1.1, comment. (n.8(a)). Although the last sentence refers to cases "involving a misrepresentation concerning the quality of a consumer product," the title to Application Note 8(a) refers to product substitution cases. The first and second sentences of Application Note 8(a) apply to cases of fraud involving misrepresentation of value, which is the other type of case referred to in the title. Thus, the last sentence, which states that "the loss is the difference between the amount paid by the victim for the product and the amount for which the victim could resell the product received," must also apply to product substitution cases. That last sentence makes resale value a relevant consideration in product substitution cases.

■ The government argues that Application Note 8(c) essentially overrides Application Note 8(a)'s implication that resale value is relevant in product substitution cases because Note 8(c), which addresses consequential damages, states that all foreseeable costs to the plaintiff resulting from the breach are to be considered in calculating the actual loss. Application Note 8(c) states:

*Consequential Damages in Procurement Fraud and Product Substitution Cases*

In contrast to other types of cases, loss in a procurement fraud or product substitution case includes not only direct damages, but also consequential damages that were reasonably foreseeable. For example, in a case involving a defense product substitution offense, the loss includes the government's reasonably foreseeable costs of making substitute transactions and handling or disposing of the product delivered or retrofitting the product so that it can be used for its intended purpose, plus the government's reasonably foreseeable cost of rectifying the actual or potential disruption to government operations caused by the product substitution. Similarly, in the case of fraud affecting a defense contract award, loss includes the reasonably foreseeable administrative cost to the government and other participants of repeating or correcting the procurement action affected, plus any increased cost to procure the product or service involved that was reasonably foreseeable. Inclusion of reasonably foreseeable consequential damages directly in the calculation of loss in procurement fraud and product substitution cases reflects that such damages frequently are substantial in such cases.

USSG § 2F1.1, comment. (n.8(c)). Application Note 8(c) says nothing about an offset for resale value. However, this omission does not undermine the application of Note 8(a) to the loss calculation. Application Note 8(c) discusses consequential damages and such damages are calculated differently from expectation damages

discussed in Note 8(a). Expectation damages are the difference between what the plaintiff was promised and what the plaintiff actually received. Consequential damages are foreseeable costs to the plaintiff as a result of the breach of the contract, over and above the plaintiff's expectation damages. Both kinds of damages are generally present in breach of contract cases and both are applicable in product substitution cases.

■ According to the note's introductory provisions, Application Note 8(c) allows a court to consider certain additional factors, such as consequential damages, in determining actual loss. However, Application Note 8(c) does not purport to be the sole provision governing loss calculations in product substitution cases. Application Note 8(a) also discusses the calculation of loss in product substitution cases. Both damages, expectation and consequential damages, are kinds of actual loss. Therefore, in calculating the actual loss the district court must calculate the expectation damages under Application Note 8(a) and the consequential damages under Note 8(c) and then add the two damages together to arrive at the actual loss. A defendant is then responsible for the injured party's costs of disposal, including any reasonably foreseeable costs of transportation or storage that precede a resale, but any loss must be offset by the resale value of the disposed goods.

As a matter of policy, this interpretation appears correct. Under ordinary contract law, a party is required to mitigate its damages. The government did not propose a persuasive policy reason that would support its argument that the market value of the disposed goods should not be offset from the disposal costs when calculating the loss. At oral argument the government indicated that it would have been too burdensome to have calculated the market value of these goods. Yet, it appears from the record that there was never any attempt made by the government to determine the value of the goods disposed of by the DOD. The DOD simply threw out the products sold by Silver and replaced them. If the government could not have determined the value of the goods sold by Silver, or could have shown that it was too burdensome to make that determination, the government should have made this showing to the district court.

We hold that the district court erred in calculating the actual loss to the DOD. The market value of the goods disposed of should be offset against the disposal costs when calculating the actual loss. We also find that the district court should have deducted the value of any products resold by the government from the actual loss calculation. Therefore, we VACATE Silver's sentence and the restitution order and REMAND for resentencing.

We find there is no merit in Silver's challenge to the district court's determination of his criminal history category.

We therefore AFFIRM in part, REVERSE in part and REMAND for proceedings consistent with this opinion.